**SAFEWAY INC., Plaintiff,**

v.

**CESC PLAZA LIMITED PARTNERSHIP,
Defendant.**

**No. CIV.A. 02–1497–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

March 6, 2003.

Barbara Susan Wahl, Joseph Ray Price, Arent Fox Kintner Plotkin & Kahn P.L.L.C., Washington, DC, for Plaintiff.

Vivian Katsantonis, Watt Tieder Hoffar & Fitzgerald L.L.P., McLean, VA, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

ELLIS, District Judge.

The central question in this action for declaratory judgment and injunctive relief

is whether a supermarket tenant reasonably withheld its consent, pursuant to a provision in its lease, to the landlord's proposed changes to a common area. The proposed changes, which are part of a larger renovation and revitalization project for the immediately surrounding urban area, involve the elimination of the existing above ground parking structure currently used by the supermarket's customers to accommodate the construction of new retail development and the relocation of the supermarket's parking to an underground garage immediately under the supermarket store. The supermarket has withheld its consent and seeks (i) a declaration that its withholding of consent was not unreasonable, and (ii) a permanent injunction to preclude the elimination of the common area surface parking that has heretofore been available to supermarket customers.

After the entry of a temporary restraining order, a bench trial was held in which the hearing on the merits was consolidated with the preliminary injunction pursuant to Rule 65(a)(2), Fed.R.Civ.P. Set forth here are the Court's findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P.

## FINDINGS OF FACT

### I. Parties and Background

Plaintiff Safeway Inc. ("Safeway"), the tenant in this action, is a Delaware corporation with its principal place of business in California. Safeway operates over 1,700 grocery stores nationwide. Defendant CESC Plaza Limited Partnership ("CESC"), the landlord in this action, is a Virginia limited partnership with its principal place of business in Virginia. CESC, a real estate developer, owns seventy percent of the office and retail space in Crystal City. Crystal City is a large office, retail and apartment building complex located in Arlington, Virginia, with approximately 400,000 square feet of retail space and approximately 10 million square feet of commercial office space.

The Safeway store at issue in this litigation is located in the Crystal City Plaza Shops, between South 23rd Street and South 20th Street (the "Plaza Block") in Crystal City. The Plaza Shops constitute an enclosed, retail mall of about 40 stores, located on the ground floor of the Plaza Block. The Safeway store opens onto the interior of the Plaza Shops mall; thus, customers coming from the surface parking lot must walk down an interior mall corridor, approximately 100 feet in length, to reach the entrance to the store. A two story parking structure runs alongside the Plaza Shops between the Plaza Shops and Crystal Drive.

CESC developed and is seeking to implement a forty million dollar renovation project designed to transform and revitalize the Plaza Block and the surrounding area. The proposed renovations, which are subject to a consent provision in Safeway's lease, include the removal of the parking structure, which provides surface level parking for the Plaza Shops and the Safeway store, and the construction of new retail stores in its place to revitalize the street front as part of a larger plan to redevelop the Crystal City area.

### II. Procedural Background

This complaint was filed on October 8, 2002. Safeway seeks a declaratory judgment that its withholding of consent to the proposed alteration of the common area is reasonable, and claims that CESC's plan to proceed without Safeway's consent constitutes a breach of the lease. Safeway also seeks preliminary and permanent injunctions prohibiting CESC from altering the common areas without Safeway's consent. CESC counterclaimed and seeks a

declaration that Safeway's withholding of consent is unreasonable, and also claims breach of the lease.

On Friday, January 3, 2003, the parties appeared on Safeway's emergency motion for a temporary restraining order. This motion was precipitated by CESC's plans to close the parking structure and commence construction activity on its revitalization project on Monday, January 6, 2003. After a hearing, the motion for a temporary restraining order was granted in part and denied in part, permitting CESC to close the structure, but prohibiting any irreversible alterations to the parking structure, and requiring CESC to provide Safeway's trucks with access to the Safeway loading dock. *See Safeway Inc. v. CESC Plaza L.P.*, Civil Action No. 02–1497–A (E.D.Va. January 3, 2003) (Order). Pursuant to Rule 65(a)(2), Fed.R.Civ.P., the trial on the merits was advanced and consolidated with the hearing on the preliminary injunction, which was scheduled for January 7, 2003. *See id.*

On January 7, after hearing argument from the parties regarding the need for further discovery and more time to prepare, the consolidated trial on the merits and the preliminary injunction was continued until January 30, 2003. By consent between the parties, construction activities were limited pending resolution of the merits of the dispute in the scheduled January 30 trial. Specifically, the parties agreed (i) that the surface lot would remain closed for parking, (ii) that the relocation of the parking to the underground lot below the store would continue, (iii) that CESC would continue to ensure that Safeway had access to Safeway's loading dock as previously provided, (iv) that no irreversible structural changes would be made to the parking structure, and (v) that pedestrian access to the rear entrance of the Plaza Shops mall would be maintained.

*See Safeway Inc. v. CESC Plaza L.P.*, Civil Action No. 02–1497–A (E.D.Va. January 9, 2003) (Order). In the meantime, CESC was permitted to proceed with some construction activities, including (i) the relocation of utilities from the parking structure, (ii) access into Safeway's leasehold space for the installation of new piping, (iii) utility work and traffic control on Crystal Drive, and (iv) alteration or removal of landscaping and fences in preparation for construction. *Id.*

The bench trial commenced on January 30, 2003, continued on January 31 and, as a result of unavoidable scheduling conflicts, the presentation of evidence continued on February 19 through 21. Closing arguments were heard on February 25. The decision in this matter was announced from the bench on February 28, 2003, and is more fully set forth and memorialized here. Thus, trial of this matter was conducted and concluded as expeditiously as possible in less than eight weeks after the filing of the January 3 motion for a temporary restraining order.

### III. Historical Background

The lease at issue here was originally entered into on May 11, 1967 by Safeway and CESC's predecessor in interest, Crystal Associates and Plaza Associates. The term of the original lease was ten years, with two 10–year options. As modified, the current lease expires on March 31, 2005, with two renewal options of five years each thereafter.

■■■ The relevant provision in the lease with regard to common area changes and consent is as follows:

4. COMMON AREAS. COMPLETION OF SHOPPING CENTER. All those portions of the shopping center not shown as building areas on Exhibit "A" shall be common areas for the joint use of all tenants, their customers, invitees and employees, and lessor hereby

grants to lessee and its customers, invitees and employees the right to use all of said common areas and any enlargement thereof.... Lessor further agrees ... that, following completion of construction of any portion of the shopping center, the sizes and arrangements of said buildings and *common areas (including parking areas) will not be changed without lessee's written consent, which shall not be unreasonably withheld,* and that if said buildings are not completed or if said sizes and arrangements are changed without lessee's written consent, lessee may cancel this lease by notice to lessor. Lessee shall not have the right to cancel this lease if less than twenty-five percent (25%) of the shopping center common area outside the area crosshatched on Exhibit "A" is removed or changed and lessor can provide equivalent shopping center common areas of equal convenience to the leased premises [emphasis added].

In addition, Paragraph 21 of the lease states:

> 21. REMEDIES CUMULATIVE. No remedy herein conferred upon or reserved to lessor or lessee shall exclude any other remedy herein or by law provided, but each shall be cumulative and in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute.[1]

The original lease was modified several times. In November 1983, the lease was modified to acknowledge Safeway's consent under Paragraph 4 to the construction of a parking structure over the existing surface parking lot that served the Plaza Shops mall and the Safeway stores. After this construction, the existing surface lot was covered by a second parking level, but continued to serve the mall and the Safeway store. In April 1984, the lease was modified again, as the Safeway store was expanded in size from the original 10,000

---

**1.** CESC moved for partial summary judgment on its contention that Safeway's remedies in this instance were limited solely to cancellation of the lease because Paragraph 4 provides that "the lessee [Safeway] may cancel this lease" in the event that the common areas are changed without its approval. This was fully briefed and argued. Thereafter, the motion for summary judgment was denied in a bench ruling that the language in Paragraph 4 did not limit Safeway's remedies to cancellation only. Under Virginia law, when parties specify that a particular remedy is available in the event of a breach, the "remedy provided will be exclusive of other possible remedies *only where the language employed in the contract clearly shows an intent that the remedy be exclusive."* Bender–Miller Co., v. Thomwood Farms, Inc.,* 211 Va. 585, 588, 179 S.E.2d 636 (1971) (considering a repair or replace remedy) (emphasis added); *see also Atlas Machine & Iron Works, Inc. v. Bethlehem Steel Corp.,* 986 F.2d 709, 712–13 (4th Cir.1993) (considering a foreclosure remedy and following *Bender–Miller* ). The court in *Bender–Miller* focused its attention on whether (i) the contract "specifically state[s]" that the remedy is exclusive, or (ii) "contain[s] any words necessarily implying a duty" to demand the named remedy before pursuing other remedies. *Bender–Miller,* 211 Va. at 588, 179 S.E.2d 636. Finding no specific language indicating that the remedies were limited to repair or replacement, and noting that the phrase "as may be directed by the Architect" was permissive, the Supreme Court of Virginia rejected the argument that the remedy was exclusive. *Id.* Here, similarly, Paragraph 4 does not specifically state that Safeway's remedies are limited to cancellation and the contractual language is permissive, providing that in the event of a breach of the paragraph's provision "... lessee *may* cancel this lease." (emphasis added). Indeed, the parties' intent *not* to make named remedies exclusive is clearly set forth in Paragraph 21, which provides that "[n]o remedy herein conferred ... shall exclude any other remedy ... by law provided, but each shall be cumulative and in addition to every other remedy ... existing at law *or in equity* or by statute." (emphasis added). Accordingly, under Virginia law the lease does not operate to limit Safeway's remedies to cancellation in this instance.

square feet to the current size of approximately 17,000 square feet. The surface parking was preserved within the new parking structure. At the same time, the lease was extended to its current duration, with a base term expiring in 2005, and with two five year options for Safeway to extend the lease until 2015.

## IV. The Store

The character, configuration, and location of the Plaza Shops Safeway store is important context for the issues at bar. Much evidence was presented by the parties to describe and locate the store within the Plaza Block. Also, a Court visit to the site provided a first-hand look at the store configuration and its environment.[2] The salient details are outlined below.

The Plaza Shops Safeway store differs from a typical, large scale suburban grocery store. To begin with it is far smaller, at 17,000 s.f., than the typical 40,000 to 50,000 s.f. "full service" store that Safeway now prefers. Nonetheless, the Plaza Shops Safeway store clearly offers a broader line than a typical convenience store or small market, as it offers a full range of groceries and various specialty departments including a deli, a bakery, a wine department and a floral department.

Although the store is at the edge of the Plaza Shops mall and abuts the parking structure, it opens only into the interior of the mall, not directly into the parking structure. Therefore, in its pre-construction configuration, customers coming from the parking structure first entered the mall through a glass door and then proceeded down a straight corridor approximately 100 feet long to the Safeway store entrance. In addition, customers were not permitted to wheel their carts out into the

parking lot; indeed, an automatic "Cartronics" system operated to lock the cart's wheels whenever a cart left the store.

The parking structure served all Plaza Shops in general and there were no designated spots reserved for Safeway customers. To park in the surface lot, customers passed through a gate and received a parking ticket, which served as the basis for imposing a charge for parking. On Monday through Saturday, parking tickets were validated for Safeway customers with purchases from the store of at least $2. On Sundays, no tickets were required; there was no charge for parking. Depending on where spaces were available, customers might be able to park directly in front of the entrance to the mall, or they might be forced to park much further away.

The underground parking structure which now serves the Safeway store likewise requires customers to drive through a gate and take a parking ticket, which if validated at the store, relieves the customer from paying the parking fee. A bank of four elevators leads from the underground parking up into the mall entrance corridor, just inside the door to the mall used by customers entering the mall from the surface parking lot of the now-closed parking structure. Again, customers might park near to the elevators or farther away, depending on where parking spaces were available.

Thus, the only significant changes caused by the shift in parking are (i) that customers are parking underground, rather than in covered surface parking, and (ii) that customers must travel up one floor in an elevator, rather than enter the mall through a door. The walking distance in either case is essentially the same. More

---

2. The site visit was conducted at the request of CESC, and was unaccompanied and informal. The impressions garnered from the visit were reported to the parties at a subsequent hearing.

particularly, although the walking distance might vary depending on how close to the elevator or entrance door one is able to park, the distance from the elevator or entrance door to the store entrance is essentially the same. In neither case could customers drive their cars directly up to the store entrance, nor could they wheel their groceries out to their cars; instead, in both parking scenarios—surface or underground—customers must carry their groceries essentially the same distance from the store to their car.

Given the store's location in the interior of the mall and the placement of the parking structure between the store and the street, the store has no street "presence," other than the signs that exist on the exterior of the parking structure, which are difficult to see from Crystal Drive. Neither the store itself nor the Plaza Shops mall entrance is readily visible through the two-story parking structure; indeed, absent the signs on the parking structure itself, there would be little or no evidence from the street of the presence of the store and the mall.

The Plaza Shops Safeway store's customer base and sales profile also differs from a typical large suburban grocery store. Both parties agree that the Plaza Shops Safeway store's primary customers are pedestrians, either office workers or nearby residents who arrive at the store on foot. It is also clear that the average transaction size is relatively small, averaging about $8 per customer during weekdays, and about $13 per customer on the weekends. Unlike a typical grocery store where weekend sales are generally higher than weekday sales, Saturdays and Sundays at the Plaza Shops Safeway store show smaller average sales than weekdays, and together weekend sales appear to ac-

count for 24% of the store's total sales.[3] In sum, whether because of the nature of the store, the inability to cart groceries to a car, or the large number of office workers and residents in close proximity to the store, it is clear that most customers to the Plaza Shops Safeway store travel to their on foot and purchase relatively small quantities of groceries.

Finally, it is important to note that competition in the general trade area (within 1 to 2 miles) has recently increased markedly, with the opening of two full-sized grocery stores in the area, a Shopper's Food Warehouse store in 1997 and a Harris Teeter store in 2001. As discussed below, these competitive openings had a significant impact on the Safeway store's sales. Furthermore, Safeway's documents indicate that the store collects only about 5% of the area's total grocery trade dollars. Yet another potential future adverse impact on the Plaza Shops Safeway store is the relocation of the United States Patent and Trade Office ("PTO") from several buildings in the Plaza Block and nearby to another location several miles away in Alexandria. Record testimony indicates that it will take six months to a year to refurbish and lease the offices vacated by the PTO. Assuming, as the record reflects, that a substantial portion of the Plaza Shops Safeway store's customer base is pedestrian traffic from the nearby office buildings, the relocation of the PTO is likely to have a significant adverse impact on the store's sales for at least six months to a year while the vacated spaces are refurbished and re-leased.

## V. Quantifying the Significance of Safeway Customers Who Drive

The parties dispute how many customers, in fact, drive to the store, and what

---

**3.** Thus, the Saturday and Sunday sales account for slightly less than their proportional two-sevenths, or 28.6%, share of the week.

percentage of sales are attributable to those customers. In an attempt to answer these questions, the results of parking validation data analysis and three separate surveys were presented in evidence.[4]

The most reliable data available for quantifying the number of Safeway customers using the surface lot in the parking structure before it was closed is the historical data on the number of customers who had their parking tickets validated at the Safeway store each day. Parking validation data is available for November and December 2002,[5] which was prior to the closing of the parking structure, and for January 6 through February 7, 2003, which is after the closing of the parking structure and the shift to underground parking. The November and December parking data reflects that, on average, approximately 50 tickets were validated per day.[6] Other Safeway financial data indi-

4. As discussed below, the three surveys presented as evidence are all offered for the truth of the statements reported in the surveys, and thus constitute hearsay; therefore they are only admissible if an applicable exception applies. Portions of the telephone survey are statements of the declarants' then-existing states of mind, and as such are admissible under Rule 803(3), Fed.R.Evid. *See Alston v. Virginia High School League*, 144 F.Supp.2d 526, 539 (W.D.Va.1999); *Schering Corporation v. Pfizer*, 189 F.3d 218, 227 (2nd Cir. 1999). The remainder of the telephone survey and the two customer intercept surveys are admissible under the residual hearsay exception, Rule 807, Fed.R.Evid. *See Dick's Sporting Goods, Inc. v. Dick's Clothing and Sporting Goods, Inc.*, 188 F.3d 501, 1999 WL 639165 at *5 (4th Cir.1999) (Table) (holding that survey results are admissible if the survey is "material, more probative on the issue than other evidence and if it has guarantees of trustworthiness"); *see also Schering*, 189 F.3d at 231 (holding that surveys are admissible if five requirements are met: "trustworthiness, materiality, probative importance, the interests of justice, and notice"). A survey is trustworthy if it was "conducted according to generally accepted principles." *Dick's Sporting Goods*, 188 F.3d 501, 1999 WL 639165 at *5. Here, as discussed below in detail with regard to each survey, none of the surveys is free from methodological flaws and limitations; nonetheless all were conducted according to "generally accepted principles," and thus, unlike the obviously flawed survey which was excluded in by the Fourth Circuit panel in *Dick's Sporting Goods*, these surveys are admissible. As indicated below, the flaws and limitations of these surveys must nonetheless be considered with respect to the weight given their conclusions.

The three surveys are also admissible under a virtually identical analysis pursuant to Rule 703, Fed.R.Evid., which allows the admission of facts or data relied on by an expert witness. *See Alston*, 144 F.Supp.2d at 539–40 (noting that the Advisory Committee Notes to the 1972 Proposed Rules indicate that Rule 703 provides a basis for admitting hearsay testimony); *Schering*, 189 F.3d at 227 (same). Under this approach, essentially the same trustworthiness inquiry must be conducted because, under Rule 703, the "facts or data" admitted must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject." Rule 703, Fed.R.Evid. Again, these studies, though flawed in some aspects, are clearly "of a type reasonably relied upon" by experts in retail planning and development.

5. The parking validation data was not retained for more than two months, and hence, only November and December 2002 data was available at the time of trial.

6. This data set has one flaw, namely that parking validation data is not available for Sundays, because the lot is open on Sundays and no parking tickets are required. Thus, Sundays are not counted in the average daily validation figure. Safeway contends that this flaw renders the parking validation data inaccurate because on Sundays, when offices are closed, its shoppers are more likely to drive. Yet, the congruence in sales data between Saturdays and Sundays, both in terms of total sales and breakdown by transaction size, suggests that there is little difference between Saturdays and Sundays in terms of customer traffic and behavior. Furthermore, there are on average only 23 parking validations on Saturdays, which is well below the overall average of 50 per day. If Sunday is similar, as the sales numbers suggest, then averaging in Sunday data would actually lower the daily

cates that, from October to November of 2002, the number of transactions per day at the Safeway store averaged approximately 1900 customers per day. Thus, on an average day, according to this data, only 2.6% of Safeway's customers had their parking tickets validated. Assuming that some small percentage of customers who parked in the lot fail to have their parking tickets validated,[7] this data suggests that approximately 3% of Safeway customers used the surface parking structure prior to its closing.

The Safeway parking validation data subsequent to the closing of the parking structure and the shift to underground parking reveals a sudden drop in validations followed by a gradual increase in the parking figures. The parking structure was closed on Monday, January 6, 2003. In the first week after the closure, there were 21 validations per day on average, well below the November–December average of 50 validations per day. Thereafter, however, the average number of validations rose to 23 per day for the second week, 36 per day for the third week, 40 per day for fourth week, and 38 per day for the fifth week, ending on February 8. This data suggests that while the switch to underground parking may have had an initially adverse effect on the number of Safeway customers who drive to the store, that effect was temporary, suggesting that customers' perceptions regarding the underground parking are changing and they are adapting to the new parking arrangement.

A second set of data available on parking for the Plaza Shops Safeway store is a parking demand study performed by Gorove/Slade Associates, Inc. ("Gorove/Slade") in February 2002. In this study, interviewers positioned at the parking ticket dispensers for the first and second level of the parking structure questioned drivers entering the lot as to their destination. Drivers were asked whether their destination was office or retail, and those who indicated retail were asked if their destination was Safeway or some other retail store. Data was collected on four different days in February, in three different time slots for each day, 8–10 a.m., 11:30–1:30 p.m., and 3:30–5:30 p.m. From the data collected, the percentage of parking lot customers naming Safeway as their destination was calculated. In the various time periods on the four different days, the percentage drivers entering the lot indicating that Safeway was their destination ranged from 2% to 9%, with one period at 20%. The average number of parking lot customers per day in February 2002 was 599. Thus, multiplying the average number of parking lot customers per day by the percentage of parking customers who indicated that they were Safeway customers suggests that somewhere between 12 to 54 Safeway customers were parking in the lot on average per day in February 2002. Thus, this study yields figures lower than the parking validation data, perhaps because its data sample covers only portions of the day.[8] Still, even if this factor

---

average of shoppers who drive and park to shop at the Plaza Shops Safeway store.

7. This is a reasonable assumption given that customers failing to obtain validation must pay a not insubstantial parking fee, as occurred when the Court visited the store.

8. The data sample of this survey is flawed as it covers only the same three isolated time

periods for each day surveyed, with the significant omission of any time after 5:30 on weekdays or any time on the weekends. The survey was designed to study the maximum demand on the lot, thus it did not sample evenings and weekends, which were times of lower parking lot demand. Safeway argues plausibly that evenings and weekends are popular times for grocery shopping, thus, the sample likely underestimates the percentage

is taken into account, this study is not inconsistent with the parking validation data. Thus, this survey, although flawed, is nonetheless useful confirmation of the parking validation data, and is accorded weight here only to the extent that it suggests that the parking validation figures are not inaccurate.

In January 2003, CESC commissioned a second Gorove/Slade study. This study, performed in connection with this litigation, attempted to determine the percentage of customers who drove to the Plaza Shops Safeway store as compared to those who walked. Safeway customers were polled by two Gorove/Slade staff members, who asked the Safeway customers whether they had driven or walked to the store, and if they had driven, where they parked. Data was collected from 6 a.m. to 10 p.m. on Tuesday through Sunday, January 14 to 19, 2003, and Tuesday through Sunday, January 21 to 26, 2003. The survey staff was instructed to interview as many customers as possible; in total, in the twelve days 5,219 customers were surveyed. Of those surveyed, only 165, or 3%, indicated that they had driven to the store.[9]

Safeway objects to the use of this data on two grounds. First, Safeway contends that the sampling method is not scientific or random. Rather than following a predictable pattern, such as interviewing every fifth shopper, the survey staff was simply instructed to interview as many as possible. Safeway argues that this creates the possibility that the results are skewed as a result of convenience bias in the sampling. For example, those who were carrying more groceries might be less likely to stop and participate in the survey, and those customers might be more likely to have driven to the store. Furthermore, because only two staff members were conducting the interviews, they might not be able to keep up with the stream of customers at busier times.[10] Safeway contends that shoppers at the busier times are therefore proportionately underrepresented in the sample. Second, Safeway points out that this survey is of limited use because it was conducted after the surface lot in the parking structure was closed to Safeway shoppers and after the parking had already been shifted underground. Thus, Safeway argues, the survey results cannot capture those Safeway customers who had decided not to shop at the store as a result of the parking switch; instead, it counts only those who were willing to park underground. In Safeway's view, the number of customers lost due to the switch, if any, is a central issue in dispute here, and thus this post-closure study is of little value in answering that question.

Contrary to Safeway's assertions, however, these flaws in the customer intercept survey are not so significant as to render the study untrustworthy and hence inadmissible. *See Dick's Sporting Goods,* 188 F.3d 501, 1999 WL 639165 at *5 (describing trustworthiness standard). Although far from perfect, the study did capture a significant percentage of Safeway customers. The 5,219 customers interviewed represents 435 customers interviewed on the average survey day, a significant proportion of the approximately 2000 customers

of parking lot users who are Safeway shoppers.

9. The collected data also indicated that customers reported, on average, that they shopped at the store 4 times per week, and on most days the customers surveyed were carrying an average of two shopping bags.

10. This was not observed to be a problem during the Court's approximately 45 minute site visit, which occurred during the lunch hour.

per day who shop at the store. Furthermore, unlike the parking demand survey, data was collected from 6 a.m. to 10 p.m., including weekends. To be sure, the data can only provide a picture of the post-closure Safeway customer profile, but for this limited purpose it appears relatively trustworthy.

In summary, the parking validation data persuasively suggests that approximately 50 Safeway customers use the surface parking lot on an average day, which represents only 3% of the Safeway store's average daily customers. By comparison, taking the range of percentages of parking structure entrants headed to Safeway reported in the Gorove/Slade 2002 parking demand survey and projecting those percentages over the average daily usage of the parking structure yields the conclusion that a range of 12 to 54 Safeway customers used the parking structure on an average day.[11] These figures correspond to approximately .6% to 3% of Safeway's average daily customers. Finally, the 2003 customer intercept survey, performed after the closing of the parking structure, suggests that 3% of Safeway's average daily customers use the underground parking lot. Taken together, these three studies tend to show that the percentage of Safeway customers who drive to the store and park in the retail parking lot is small and that the closing of the surface parking lot and the subsequent switch to underground parking has not had a significant impact on Safeway customer traffic.

Safeway conducted its own study for purposes of this litigation. It commissioned the Polling Company, Inc. ("PCI") to perform a telephone poll of Safeway card customers (i) to quantify the usage of the surface parking lot prior to its closure

and (ii) to assess customers' attitudes concerning underground versus surface parking and the likely effect the shift to underground parking would have on their shopping habits. The survey consisted of 37 questions. The poll was conducted using information provided by Safeway concerning Safeway shoppers with Safeway Club Cards who shopped at the Plaza Shops Safeway store during the fourth quarter of 2002. From the Club Card information collected by Safeway, a list of 12, 171 shoppers was compiled. From this list, 8,292 usable phone numbers were retrieved. On January 13 through 15, 2003, 21,000 telephone calls were placed to those numbers, resulting in only 353 completed interviews. Thus, of over 20,000 calls, 98% resulted in no data because there was no answer, because the respondent was not qualified, because the respondent declined to participate in the survey, or for some other unknown reason. Survey participants were screened to ensure that they were over 18 years of age and that they were primarily or jointly responsible for grocery shopping in their household, and to confirm that they shopped at the Plaza Shops Safeway store.

In an effort to ensure a representative sample, PCI analyzed data provided by Safeway setting forth each card holders' decile ranking with regard to the average amount spent per transaction, and weighted the survey results to ensure a proper representation of low, middle, and high spending shoppers. According to PCI's president, Ms. Kellyanne Conway, the margin of error for this survey is plus or minus 5.7% at the 95% confidence level for the overall results, and higher for the data

---

11. As discussed above, the limited data sample in this study does not allow much weight to be placed on this projection.

provided on smaller subgroups, such as the high spending shoppers.

According to Ms. Conway's testimony, 22% of the survey respondents reported that they drive at least half of the time to the store. This population is referred to in the study as "majority drivers." Seventeen percent of those surveyed reported that they always drive.[12] Thirty-eight percent of the customers reported that they drive at least 1% of the time to the store.[13] Anyone who reported driving at least 1% of the time is considered a "driver" for the purpose of the study. Not all of these drivers used the surface parking lot that is the subject of this litigation. Of the drivers surveyed, only 66% reported that they typically parked in the now-closed surface level lot next to the Safeway store.[14]

These quantitative figures from the telephone survey are difficult to reconcile with the parking validation data. For example, if 17% of customers always drive, and they park in the surface lot 66% of the time, they should account for 17% × 66% or about 11% of Safeway's daily average of approximately 2000 customers. This data thus predicts about 220 people parking in the surface lot per day from this group. That number is a low estimate of the overall number of Safeway drivers on an average day predicted by this study, as it does not include those who drive some of the time to the store but not always. On the other hand, we know that on average only 50 parking tickets per day were validated by Safeway in the two months prior to the closing of the surface parking lot. It is very unlikely that only a quarter of those who used the surface have their parking tickets validated.[15] Yet, the telephone survey data is not completely irreconcilable with the parking validation data. For instance, the difference in results could be accounted for if those who drive to the store shop far less frequently at the store than those who walk, which would account for the drivers' infrequent presence in the surface parking lot.[16] At any rate, the methodological problems discussed below cast doubt on whether the telephone survey data can be reliably used to quantify the number of shoppers who drive to the Safeway and contradict the parking validation data.

The telephone survey also seeks to provide information about the survey respondents' attitudes towards surface parking and underground parking in general, as well as their attitudes about the change in parking at this Safeway store. Thus, when asked the general question of which type of parking they felt was more convenient, 71% of survey respondents reported that they found ground level parking more

12. The summary of the survey results shows that those who drive 91–100% of the time are included in the group that "always" drives.

13. These three populations are overlapping, not separate. Thus, the 38% figure includes the 22% who drive at least half the time, which in turn includes the 17% who always drive.

14. Seventeen percent reported that they parked in the underground parking below the Plaza Shops mall, 11% reported parking on the street, and 3% reported parking in the second deck of the parking structure above the surface level lot. The underground park-

ing lot was not available for public retail parking prior to the January 6, 2003 switch to underground parking.

15. Or, alternatively, that three-quarters of the drivers fail to have their parking tickets validated.

16. In other words, the parking validation data provides an indication of what percentage of Safeway's daily transactions involved customers who drove to the store, while the telephone survey, at best, provides an indication of what percentage of Safeway's customer base as a whole typically drive to the store.

convenient, compared to only 12% who found underground parking more convenient.[17] Of those who reported driving to the Safeway store at least half of the time, 87% found ground level parking more convenient than underground parking as a general matter, while only 6% found underground parking more convenient. Similarly, 71% of all survey respondents, and 83% of majority drivers felt that ground level parking was safer, as compared to 11% of all respondents and 6% of majority drivers who felt that underground parking was safer.

After being informed that the surface parking lot was currently closed at the Crystal City Safeway store and that customers were now directed to park in the underground lot below the mall, 25% of all survey respondents indicated that this change made them less likely to shop at the store (11% reported they were "somewhat less likely," and 14% reported they were "much less likely"). Of the majority drivers, 53% reported being less likely to shop at the Safeway store as a result of the current closure, while 24% of high spending shoppers, that is, those in the top 40% in terms of per transaction sales, indicated that they are less likely to shop at the Safeway store. If this change were made permanent, 27% of all customers, 60% of majority drivers, and 24% of high spending shoppers reported that they are less likely to shop at the Crystal City Safeway store. Of course, this data indicates only that the shoppers report that they are "less likely" to shop there, it does not provide a basis by which one could calculate how many shoppers would in fact cease shopping at the Safeway store or reduce their visits to the store in response to the change in parking. It should also be noted that, of all the shoppers surveyed, 62% indicated that the current change in parking would have no effect on their likelihood of shopping at the store, while 11% indicated that they would be more likely to shop there after the change in parking.

There are substantial methodological problems with the telephone survey data that cast doubt on the quantifiability and reliability of the results reported. First, the relatively small yield of interviews granted compared to customers contacted suggests that those answering the survey may not in fact represent typical Safeway customers. Out of 12,171 identified Club Card shoppers, 8,292 had usable phone numbers listed, yet the 21,000 calls which were placed yielded only 350 interviews. Clearly, many who were qualified to answer the survey chose not to do so, and those with the time and inclination to answer a 37 question telephone survey may not be representative of the customer base as a whole. This raises the possibility that some kind of sampling bias may have occurred in the gathering of the results.

Second, the screening criteria used at the outset of the survey may have skewed the sample towards those who are more likely to buy groceries in large quantities, and hence, those who may be more likely to drive. Telephone numbers were available only for those shoppers who held Safeway club cards. Cardholders were responsible for 56% of the transactions in the fourth quarter of 2002, and thus represented a bare majority in terms of the number of transactions, but were responsible for 73%, or almost three-quarters, of the sales in the same period. This indicates that the cardholders as a group buy more per transaction than non-cardholders. Moreover, survey respondents were asked whether they were "primarily responsible

---

**17.** It is this portion of the survey that falls within the state-of-mind hearsay exception, pursuant to Rule 803(3), Fed.R.Evid. *See supra* n. 4.

for shopping and purchasing the food and groceries for the household." Only those who answered yes were kept in the sample. It is clear that the Safeway store has a large population of lunchtime and convenience shoppers; yet these shoppers are not included in the survey unless they are also the primary grocery shoppers for the household. In short, the sample was likely skewed toward a subclass of Safeway shoppers.

Next, with respect to the questions on customer attitudes towards underground parking, the questions posed did not make clear that the distance a customer would have to walk would remain the same, whether parking underground or above. Thus, there is no way to know what assumptions the shoppers made in responding to these questions.[18]

Taken together, these methodological flaws, combined with the unexplained difference between the survey results as to the number of Safeway drivers and the much lower parking validation numbers, suggest that the telephone survey should be afforded less weight on the quantitative question of how many of Safeway's customers regularly drive to the store. By contrast, the parking validation data and the results of the two Gorove/Slade surveys are more generally consistent, and the parking validation data in particular appears the most reliable data on this question. In sum, the data presented in all four studies, taken as a whole and considering the methodological flaws of the surveys presented, leads to the conclusions that substantially less than 10% of the Safeway store's customers, indeed, likely closer to 3% of the customers, drove to the store and parked in the surface parking area on an average day.

A more difficult question is what percentage of sales is attributable to these drivers. Both the average sales per transaction figure of $8 and the breakdown provided of the number of transactions in the various price ranges indicate that a large proportion of the transactions at the store are very small.[19] In this regard, then, those who spend more per transaction will have an effect on overall sales disproportionate to their number in terms of percentage of transactions. In an attempt to quantify this effect, Safeway presented data late in the trial indicating that transactions over $30 account for 24% of the total sales revenue at the store, even though they represent only 4% of the total

---

**18.** A less significant flaw is that some survey questions were phrased in a manner that invited ambivalence while others were not. Thus, in question 18, cardholders were asked whether the change from ground level to underground parking at the Plaza Shops Safeway store would "have a ... mostly negative, mostly positive, or no effect on how frequently you would shop at the Crystal City Safeway store," and 75% indicated it would have no effect, with only 21% claiming a negative effect. Yet, in question 19, which asked cardholders whether this change would "make you ... more or less likely to shop at the Crystal City Safeway," customers were not invited to indicate that the change would have no effect on them. This inconsistent phrasing lead to a larger number of customers claiming they would by negatively effected, 25%,

even though the substance of the question is virtually identical to question 18. Notably, however, 62% of customers *volunteered* in response to question 19 that the change would not effect the likelihood of their shopping at the Safeway store.

**19.** Transaction count totals for September 8, 2002 through November 2, 2002 reflect the following:

| Price Range | Percentage of Transactions |
|---|---|
| under 1$ | 9.5% |
| $1 to $3.99 | 35.4% |
| $4 to $10.99 | 34.0% |
| $11 to $20.99 | 13.3% |
| $21 to $30.99 | 4.3% |
| $31 to $50.99 | 2.5% |
| $51 to $100.99 | .9% |
| $101 and above | .1% |

transactions.[20] Safeway contends that this data shows that drivers, although a small percentage of customers on a given day, are responsible for a significant percentage of store sales. This contention depends on the unproven assumption that the highest spending shoppers[21] are likely to be drivers. While this assumption is not implausible, it is not supported by any persuasive data on the precise point. In any event, even assuming that the small percentage of shoppers who are drivers account for a disproportionately large share of store sales, this does not affect the result reached here because the record persuasively reflects that the number of shopper-drivers and weekly sales revenues are returning to the levels that existed prior to closure of the surface parking area. This is consistent with persuasive record testimony that shoppers' negative perceptions of underground parking, assuming they exist, are amenable to change and indeed that shopper-drivers adapt readily to underground parking.

Safeway further argues that those who drive to the store are more likely to spend more at the store per transaction as compared to walkers, who must carry their groceries back to their destination. The conclusion that there is some correlation between high per-transaction sales and those who drive to the store is plausible, even though in this instance customers may not wheel their carts directly out to their cars, so that even the drivers must tote their groceries by hand at least some distance. Nonetheless, the strength of the correlation is unknown, and no persuasive data has been provided regarding the actual revenue generated by those who drive to the store.

In sum, the best data available indicates that substantially less than 10%, and probably closer to 3% of Safeway customers drive to the store on an average day. While it is true that the majority of customers may regard underground parking negatively, Mr. Buckley, CESC's expert, persuasively testified based on his experience with similar urban redevelopment plans across the country[22] that these negative perceptions change readily and customers adapt expeditiously and well to underground parking, provided steps are taken to address concerns regarding convenience and safety. Indeed, the parking validation numbers from January 2003 persuasively suggest that Safeway customers at the Plaza Shops store are, in fact, following this pattern and in large measure are adapting well to the underground parking.

## VI. Recent Sales History and Performance

Historical sales data indicates that there is a clear, long term-trend of declining sales at the store, dropping from an average weekly sales figure of $151,700 in 1996 to only $117,500 in 2002. The trend line is not uniformly negative, but rather shows

---

**20.** This data was not presented during discovery, and thus the defendant argued that it had no adequate opportunity to challenge this data. Nonetheless, these figures do not appear inconsistent with the data presented during discovery regarding numbers of transactions in a given dollar range. Accordingly, they are entitled to some weight, despite defendant's objection.

**21.** The telephone survey classifies high spending shoppers as those in decile 7 or above, that is, the top spending 40% of Safeway's cardholders. This group includes those with an average per transaction expenditure of $12.74 or more, and thus the telephone survey data is not probative as to the much smaller percentage of customers who spend $30 or more per visit.

**22.** Mr. Buckley's experience and qualifications are described *infra*, n. 19.

substantial sales declines in 1997 and 1998 followed by modest increases in 1999 and 2000, and then large declines again in 2001 and 2002. Safeway therefore argues that the store sales data indicates that the store had successfully "turned the corner" after taking a substantial "hit" in sales following the opening of the Shoppers Food Warehouse store in 1997, and that the recent sales figures suggest that the store was again "turning the corner" after the opening of the Harris Teeter store in 2001. Even assuming this characterization is accurate, the data nonetheless reveals that, by 2002, sales had decreased substantially as compared to the 1996 figures. In 2002, the store ranked 134th out of 136 Safeway stores in the Eastern Division in terms of average weekly sales. The clear trend of declining average sales over time establishes that the store is suffering competitively, and raises substantial questions concerning its long-term viability.

Yet, despite the declining sales, the store remains marginally profitable. Aside from one negative year in 1998, the store's operating income remained positive from 1996 to 2002. Nonetheless, the short range trend on operating income is negative, dropping from a high of $6,500 in average weekly operating income in 2000 to $3,800 in 2001 and then down to only $1,800 in 2002. In 2002, the store ranked 118th out of 136 Safeway stores in the division in terms of average weekly operating income. Again, Safeway argues that the sales data indicates that the store has recovered and will continue to recover from competitive pressure owing to new

grocery store openings in the area. This optimistic view is questionable and does not erase the fact that, the figures indicate that the average operating income has recently declined to a barely positive margin averaging only $1,800 per week.

In short, the historical sales and income data indicate that, prior to the closing of the parking structure on January 6, 2003, the store could aptly be described as "on the bubble," *i.e.*, still a marginally profitable store for Safeway, but with serious questions regarding its long term viability and obvious vulnerability in case of a further sales decline. In this regard, Thomas Castleberry, the Vice President of Real Estate for the Eastern Division, testified in response to a hypothetical question that, given the current market conditions, he would not now choose to invest in a 17,000 s.f. Safeway store in the current store location, even if the surface parking situation remained unchanged. Nonetheless, Castleberry testified, unconvincingly, that in his judgment, the store would remain profitable through the end of the lease extensions in 2015, provided some remodeling and renovation were performed on the store, but only if the surface parking remained unchanged.[23]

Also available in the trial record is recent sales data concerning the weeks immediately before and after the January 6, 2003 closing of the surface parking structure and the redirection of Safeway customers to the underground parking lot. For the last four weeks of 2002, weekly sales at the store averaged $108,700, and for the week ending January 4, 2003, the

---

**23.** In explaining why he would not now invest in a store at this location as an original matter, Mr. Castleberry explained, in part, that replacing the current old equipment with new equipment would be "considerably more expensive than what we have." He later indicated that the current equipment was "shot" and needed replacement, and that the store

would not be profitable down the road without such a renovation. Meanwhile, he described the store as "at the tipping point" and opined that "it can't take another $10,000 a week in loss." Thus, it is not at all clear that significant new investments in equipment could be made without rendering the store unprofitable.

final week before the parking structure was closed, sales totaled only $94,169. Immediately after the parking structure was closed, in the weeks ending January 11th and January 18th, sales rose to $118,899 and $118,574 respectively. Sales decreased to $112,703 for the week ending January 25.[24] Taken together, these three weeks of sales figures suggest that the removal of surface parking did not affect sales, as these sales figures actually increased slightly over recent sales figures, and are more or less in line with the $117,500 weekly sales average for all of 2002. Safeway, however, contends that the January figures indicate that closing the parking structure hurt sales, because the weekly figures are 3.9% to 6% lower than sales figures in the same three weeks in January 2002. Significantly, however, sales in the week ending January 4, 2003 were down 12% over sales in the same week in 2002. In other words, it appears that the 2003 sales figures are generally lower than the 2002 figures, so that comparison with 2002 figures may reflect a general downturn in sales rather than any effect attributable to the closing of the surface lot. Moreover, the increase in sales from $94,169 to $118,899 in the very week that the parking structure closed not only casts doubt on Safeway's contention that the change is actually hurting its sales, it also persuasively suggests that something other than the parking changes are driving the store's performance figures downward.

## VII. Negotiations to Expand or Move the Safeway

In 1997, Safeway began considering plans to renovate, expand or move the store, none of which were ultimately imple-mented. The store has remained essentially unchanged since the 1985 expansion and renovation. Typically, according to testimony from Mr. Castleberry, Safeway considers remodeling its stores every eight to twelve years; thus, by this standard, the Plaza Shops Safeway store was then due, and is now long overdue, for a revitalization. In addition, the series of plans to renovate, expand, or move the store reflect Safeway's efforts to address the challenges the store faced, due to its size, location, and increased competitive pressure.

Beginning in 1997, Safeway considered remodeling the store in its current location. Plans for the renovation were developed by local Safeway executives and were submitted to the corporate headquarters in California. At different times, renovation proposals costing $1.3 million and $1.7 million were submitted, but never finally approved.

The renovation plans were abandoned in early 1999 when Safeway and CESC commenced discussions regarding the expansion of the store at its current location to 30,000 s.f. This plan would have expanded the store toward Crystal Drive, where the parking structure is located, but would have retained some surface parking for Safeway customers. Besides providing greater sales space, the expansion would have improved Safeway's visibility and street presence by expanding the store towards the street. Safeway ultimately rejected this plan, largely because 30,000 s.f. did not provide enough space to offer a full-service Safeway grocery store, although site plan considerations were also an issue. In sum, Safeway determined that the cost of the expansion to 30,000 s.f.

---

**24.** One more week of sales figures is available for the week ending February 15, 2003, which shows a sharp increase in sales to $141,184 for the week. This figure, however, is likely anomalous, as customers were probably stocking up on groceries in anticipation of a major snow storm, which indeed came to pass.

could not be justified by the expected returns on a store that size in that location.

In the summer of 2000, negotiations between the parties turned to a possible relocation of the store to a new location within Crystal City, at the intersection of 18th Street and Crystal Drive (the "18th Street location.") There, the parties planned to construct a much larger store of approximately 50,000 s.f. This space would allow Safeway to provide a full service grocery store with all the amenities typical of a large, full-service Safeway store. The corner location would also greatly improve Safeway's visibility and street presence. Notably, parking at the 18th Street location was to be entirely underground. To mitigate Safeway's concerns that grocery customers typically find surface parking more convenient, plans were discussed to provide dedicated underground parking spaces for the grocery store as well as a dedicated elevator, an escalator, and stairs leading from the parking garage to the store.

Local Safeway executives submitted and favored a plan to the corporate office in California, projecting an $11.6 million investment in the new store at the new location. Corporate headquarters voiced a concern that the plan required underground parking and questioned whether the store location was sufficiently accessible to consumers in the trade area. Nonetheless, the expansion was still under active consideration by Safeway at the time it fell through and it is clear that the responsible Safeway executives in this division, *i.e.* Mr. Castleberry, were entirely willing to accept underground parking in connection this proposal. Through no fault of either party, this relocation plan was scuttled after September 11, 2001, because of security concerns regarding public parking under a building in which the Department of Defense was a tenant, as

was the case at the 18th Street location under discussion.

Thereafter, negotiations between the parties returned again to plans for the store at its current location in the Plaza Block. Significantly, however, in 2000, while the parties were considering the relocation of the Safeway store to the 18th Street block, CESC developed plans to transform, revitalize, and redevelop the Crystal city area, including the Plaza Block. These plans and their timing are fully discussed below and include replacing the parking structure that served the Safeway store with a row of new retail stores facing onto Crystal Drive. Thus, once it became clear that the Safeway store would remain in its present location, the parties' negotiations turned to accommodating or expanding the existing store within the new plans for the Plaza Block. It is these negotiations, and Safeway's refusal to consent to the elimination of its parking structure, that led to this action.

## VIII. The Crystal City "Repositioning" Project

The demolition and replacement of the parking structure with new retail space is part of a larger revitalization plan affecting much of Crystal City. Changes include the development of a new "main street" by changing Crystal Drive, currently a one-way street, into a two-way street lined with outdoor cafes, restaurants, and shops. These and other changes will alter the current, awkward one-way street layout into a more typical and convenient urban grid plan. With the elimination of the parking structure, all parking would be moved underground, with two new entrances to the parking garage replacing the current single entrance. The plan also involves an improved landscape for pedestrians, a broad sidewalk, and new pedestrian access points to the Plaza Shops mall.

CESC plans to invest as much as $40 million in the project.

CESC's redevelopment plans for the area including the Plaza Block required significant changes to the Arlington County's master plan as well as rezoning. Given this, the plans were subject to thorough review and approval by Arlington County. The plans were submitted to the County beginning in October of 2000, and were ultimately approved in May of 2001. Thus, long before the necessary abandonment of the plans for an 18th Street store, CESC had already invested substantial funds in planning, retaining experts and consultants, and in winning planning and rezoning approval from the County.

CESC's expert, Mr. Buckley, who also served as a consultant on the development of the Crystal City revitalization project, described the revitalization project as typical of the modern "street retail" approach to urban development, and contrasted it sharply with the existing Crystal City environment, which he described as an outdated holdover from the 1960s and a "concrete jungle" with little or no street presence. Mr. Buckley opined, convincingly, that the project would benefit all of Crystal City's tenants and the general public by "rebranding" the area as a "retail destination." According to Mr. Buckley, the more active street front and new mix of restaurants and shops would extend retail activity into the evening hours and weekends and draw more customers from the general area, to the benefit of all tenants and the general area. Based on his experience with similar projects in other urban areas,[25] Mr. Buckley also predicted the changes would be of great benefit to the Safeway store, notwithstanding the change in parking. Specifically, Mr. Buckley argued that the revitalized street front and increased retail activity would draw more customers into the Plaza Shops mall and the Safeway store, that those driving to the store would find the new traffic configuration more convenient. Mr. Buckley also testified persuasively, based on his experience with the Prudential Center redevelopment in Boston and elsewhere, that customers' negative perception of underground parking can be altered, and that urban customers readily adapt to new traffic patterns and parking situations given an improved overall shopping experience.

The record does reflect that no leases have yet been executed, that the mix of tenants remains in flux, and that the ultimate redevelopment plan may not reflect the ideal plan and mix of tenants advocated by Mr. Buckley. Safeway points to some evidence that this is so. A heavier emphasis on restaurants and fewer retail stores might be less beneficial to Safeway, because, as Safeway argues, dining customers may be less likely to combine going out to dinner with a shopping visit, and because the new restaurants may capture some of Safeway's customers' food dollars.

25. Mr. Buckley has been involved in numerous projects as a developer, operator, and consultant, including mixed office and retail developments such as the Prudential Center in Boston, Massachusetts, Cameron Village in Raleigh, North Carolina, and Sarasota Quay in Florida. The Prudential Center, in particular, involved the renovation and addition of retail stores at the base of a large office and residential center, and includes a new grocery store with no surface parking that performs exceptionally well. Mr. Buckley also worked on a government center in Miami, Florida and a shopping center in Mountain View, California. Mr. Buckley also taught at MIT, and currently teaches at Columbia and is the Director of the Real Estate Development program at Columbia University, while continuing with his private consulting practice. Thus, he has extensive practical knowledge as well as academic expertise concerning the type of development at issue in this case.

Mr. Buckley countered, noting that customers are not so rigid, and may often grocery shop after a dinner at a restaurant, though they are concededly not likely to do so before dinner. While the precise tenant mix remains unsettled, it appears likely on this record that CESC's urban revitalization project will have a beneficial effect on the Plaza Shops Safeway store even given the switch to underground parking.

## IX. Safeway's Withholding of Consent to the Proposed Common Area Alterations

Understandably, much record evidence is devoted to the negotiations concerning Safeway's refusal to consent to the proposed changes to the common area required by the urban revitalization project. Testimony was provided by Mr. Castleberry and Avis Black, who handled the negotiations for Safeway, and Henry Fonvielle, CESC's Senior Vice President in charge of the retail department, who handled the negotiations for CESC. In addition, the record contains numerous letters between the parties with regard to the negotiations. The salient details of the negotiations are recounted here.

After the 18th Street relocation plan fell through, Safeway' once again returned to considering how to renovate the store in its existing location in the Plaza Block. In the meantime, CESC considered how to incorporate the Safeway store into its plans for the redevelopment of the Plaza Block.

In November of 2001, CESC had plans drawn up which included a Safeway store of approximately the same size (50,000 s.f.) as had been planned for the 18th Street location within the Plaza Block. These plans were unsatisfactory, however, as the vastly expanded store took up almost all of the street front space, thus conflicting with

CESC's urban revitalization design for an active and varied street front. These plans were not presented to Safeway.

Starting in December 2001, CESC presented plans to Safeway showing either the existing Safeway configuration within the remodeled Plaza Block, or a proposed expansion of the Safeway store to 30,000 s.f. within the remodeled Plaza Block. All of these plans involved the elimination of the parking structure and the surface parking lot that served the Plaza Shops mall and the Safeway store and its replacement by new retail stores. All retail parking, including Safeway's, was to be rerouted to the underground garage.

Safeway deemed the plans presented in December 2001 "utterly unacceptable," in part because Safeway would lose its loading dock area adjacent to the store and would be required to share loading space with other tenants 100 feet away from the store. Subsequently, CESC developed revised plans in January 2002 which addressed these loading area concerns. Safeway was to retain its loading dock precisely as it presently exists, and other tenants would be required to use a central loading facility immediately adjacent to Safeway's loading dock.

On February 1, 2002, CESC submitted the two new, alternative designs to Safeway, and requested Safeway's consent to the proposed changes to the common area. Safeway rejected both plans and refused consent. Safeway did not deliberate over this decision; instead, the matter seemed relatively clear to Safeway. On the one hand, earlier studies regarding expansion in this location suggested that the added benefits of a store expanded only to 30,000 s.f. would not match the benefits of a larger expansion, and could not justify the cost of such an expansion. Indeed, in Safeway's view, this alternative was essentially the same as the previously consid-

ered 30,000 s.f. expansion, yet with the added negative of the elimination of the surface parking. For Safeway, remaining in the current location at the current size, but without the surface parking lot, was not acceptable. In addition, Safeway continued to have loading and visibility concerns.

In response to this refusal, CESC sent letters on February 15 and March 21, 2002, further explaining the expected benefits to Safeway of its urban revitalization project, offering additional concessions, and again requesting Safeway's consent. Thereafter, in an April 8, 2002 letter, Safeway formally stated the reasons for refusing to consent to the plans. Safeway voiced three main concerns, consistent with its earlier explanations, namely (i) that the elimination of surface parking and the shift to underground parking would be viewed negatively by customers and would result in a loss of sales, (ii) that the construction of new retail stores in place of the parking structure would relegate Safeway to a "secondary, interior retail area," reducing its visibility and presence, and (iii) that the consolidated loading area would require Safeway to share its loading area with other tenants, creating interference with Safeway's vital loading operations. In further letters and telephone conversations, the parties continued to discuss the matter, with CESC arguing that Safeway would benefit from the overall plan and offering further concessions, while Safeway continued to refuse to consent.

During the course of these letters and conversations, CESC sought to alleviate Safeway's concerns on several fronts.

With regard to loading, CESC made clear that Safeway would retain its current exclusive loading dock, with better access, and a dedicated dock master to handle any potential interference between Safeway's deliveries and those of other tenants using the adjacent common loading area. With regard to visibility, CESC promised new and improved signage indicating the presence of Safeway and directing customers to the underground garage, as well as improved pedestrian access and new treatments of the entrance to the Plaza Shop malls designed to attract more pedestrians into the mall. CESC sought to counter Safeway's concerns regarding the negative impact of the switch to underground parking by pointing out that the urban revitalization project would bring new traffic and customers to the general area, which would, in CESC's judgment, outweigh any negative effects on parking.

CESC also suggested other concessions, such as dedicated parking in the underground lot for Safeway customers, and the construction of a dedicated new elevator that would take customers from the parking lot to a location directly opposite the store entrance. By August, 2002, CESC had also offered Safeway a reasonable guarantee of profitability, although the size and duration of that guarantee was never discussed because Safeway never indicated any interest.[26] Nonetheless, Safeway remained firm in its position that the proposed changes were not desirable for the Safeway store and that the refusal of consent was therefore reasonable. Accordingly, Safeway did not pursue, or make inquiries concerning, any of the proposed CESC concessions.

---

**26.** At trial, Mr. Fonvielle testified that CESC would have provided a guarantee of profitability at least through the period of construction, that is, through the summer of 2004, and that CESC remained willing to do so. In other words, if the Safeway store's sales were to fall to the point that the store became unprofitable as a result of the construction activities, CESC would make up the difference.

While these negotiation were ongoing, the parties also discussed a possible buyout and termination of the Safeway lease. Ms. Black performed a store closing analysis which suggested that the continuing value of the store and the lease was $2.5 million, and received permission from corporate headquarters to negotiate a buyout on that basis.[27] When presented with this offer in the summer of 2002, CESC rejected it as far too high. In September, CESC eventually offered Safeway $1 million to terminate the lease and vacate.[28] Neither party budged from its buyout negotiating position, and these talks did not bear fruit.

By the end of August 2002, negotiations had deteriorated to the point that CESC informed Safeway that its refusal to consent was unreasonable, and that CESC would be forced to consider pursuing its urban revitalization project notwithstanding Safeway's refusal to consent. In response, Safeway reaffirmed its intention to refuse consent. The instant action was filed soon thereafter, in October 2002.

Notably, throughout this period of negotiations, Mr. Castleberry and Ms. Black did not conduct any analyses, quantitative or otherwise, to attempt to determine the actual effects on the store of the switch to underground parking. During this period, they did not attempt to discover how many of their current customers used the surface parking structure, or the sales attributable to those customers. They did not review available data on sales, nor did they review parking ticket validation records, in an effort to answer these questions. Instead, in refusing to consent to the elimination of the parking structure, they relied entirely on their business judgment, based on past experience with stores of various sizes in the area, with and without surface parking lots. In Safeway's view, the company's substantial experience in the grocery business was an adequate basis to conclude that the proposed changes would adversely affect the Plaza Shops Safeway store. Only after the entry of the temporary restraining order did Safeway and CESC undertake to conduct studies seeking to ascertain and quantify the effect of the loss of surface parking on the store.

## CONCLUSIONS OF LAW

### I. Jurisdiction and Venue

There is subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship and the amount in controversy exceeds $75,000.

There is personal jurisdiction over both parties here because both parties regularly transact business in Virginia and both parties have an interest in real property that is the subject of this action.

There is venue here, pursuant to § 1391(a)(2), because the real property that is the subject of this action is situated in this district.

### II. Reasonableness of Consent

The central dispute is whether Safeway was reasonable in withholding its consent, pursuant to Paragraph 4 of the lease, to

27. Given the marginal financial performance of the store, CESC asserts that this figure was inflated, while Ms. Black maintains that it is simply the objective result of a store closing analysis. Furthermore, documents in the record indicate that the store closing analysis value declined over time as additional analyses were performed using different time periods and reflecting declining average sales.

Whether $2.5 million is, in fact, a reasonable figure is not directly at issue here.

28. Mr. Fonvielle also testified that CESC was willing to offer Safeway $1 million to cover renovation costs if it chose to stay in the location, but Safeway disputes whether such an offer was made.

the changes to the common areas proposed by CESC, specifically the removal of the parking structure and its replacement by new retail space extending to Crystal Drive, thereby requiring all retail customers to park in the underground parking beneath the Plaza Block.

 Under the rule in *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), a federal court in Virginia in a diversity jurisdiction case, as here, must apply Virginia choice of law rules. There is no choice of law provision in the lease between the parties. Therefore, under Virginia choice of law rules, Virginia law governs the instant lease dispute because Virginia is the place where the lease was executed and is to be performed. *See Woodson v. Celina Mut. Ins. Co.*, 211 Va. 423, 426, 177 S.E.2d 610 (1970) (holding that the "nature, validity and interpretation of contracts are governed by the law of the place where made, unless the contrary appears to be the express intention of the parties.").

 As an initial matter, the parties dispute the locus of the burden of proof on the reasonableness issue, namely whether Safeway bears the burden of showing that its withholding of consent was reasonable, or whether CESC bears the burden of proving that Safeway's withholding of consent is unreasonable. In this regard, it appears both settled and reasonable that the burden lies with the party seeking consent to show that the party withholding consent acted unreasonably. *See Leggett of Virginia, Inc. v. Crown Amer. Corp.*, 1995 U.S. Dist. LEXIS 6536 at *5 n. 3 & *13 (W.D.Va. March 8, 1995) (holding that the landlord "bear[s] the ultimate burden of persuasion" on the issue of the tenant's reasonableness in withholding consent); *Marriott v. Fisher*, 1994 WL 1031295 (Va. Cir. Ct. Aug. 15, 1994) (holding that the tenant in that case had the burden of showing that the landlord unreasonably withheld consent).[29] The Restatement language regarding the burden of proof in situations where a landlord or tenant withholds consent to the transfer of a lease interest is apt and persuasive on the burden of proof in this closely related question.

> If a denial of a request for consent to a proposed transfer is accompanied by a statement of the reason or reasons for the denial, then *the party seeking the consent* proceeds at his risk if he goes through with the proposed transfer. The *burden of proof will be on him* to establish that the reason or reasons advanced are unreasonable.

Restatement (Second) of Property: Landlord & Tenant § 15.2 cmt. g (emphasis

---

**29.** *Dart Drug v. Nicholakos*, 221 Va. 989, 277 S.E.2d 155 (1981), cited by CESC for the proposition that Safeway should bear the burden here, is at best unclear on this issue and, in any event, is not on point. The lease in *Dart Drug*, unlike the lease here in issue, did not include a provision regarding the reasonable withholding of consent. *Id.* at 992, 277 S.E.2d 155. Instead the Supreme Court of Virginia interpreted the lease to require first that the landlord's proposed alterations be reasonable, and then that the tenant's withholding of consent not be unreasonable. *Id.* at 995, 277 S.E.2d 155. Thus, based on its construction of that specific lease, the *Dart* court set out a more complicated, burden shifting approach that is not applicable here. *See id.* at 995–996, 277 S.E.2d 155. Further, it is not clear in *Dart* that the language requiring the tenant to "go forward with evidence showing . . . the reasonableness of the refusal to consent" places the ultimate burden of persuasion on that issue on the tenant, or whether it shifts the burden only temporarily in response to the required landlord's prima facie showing. *Id.; see also Leggett* at *13 (noting that decision to put the *ultimate* burden regarding reasonableness on the party seeking consent is consistent with *Dart*.)

added).[30]

■ The next step in the analysis is to identify the standard for determining whether a tenant's refusal to consent to proposed changes to a shopping center plan is reasonable. The *Leggett* case accurately states this standard; similar to cases involving refusal to consent to the assignment of a lease interest, the party withholding consent must produce "valid business reasons for its decision." *See Leggett*, 1995 U.S. Dist. LEXIS 6536 at *6. Again, the Restatement states the proper standard:

> A reason for refusing consent, in order for it to be reasonable, must be objectively sensible and of some significance and not based on mere caprice or whim or personal prejudice.

Restatement (Second) of Property: Landlord & Tenant § 15.2 cmt. g. Thus, examples of unreasonable grounds for refusal would include "intent to improve economic position, personal taste, convenience, sensitivity, or personal satisfaction." *Marriott*, 1994 WL 1031295 at *1. Valid reasons to refuse consent to the alteration of a shopping center's common area may include parking, visibility, accessibility, and concerns about the presence and size of competitors in the shopping center. *See, e.g., Leggett* at *7–6; *K–Mart Corporation v. Oriental Plaza*, Inc., 694 F.Supp. 1010 (D.P.R.1988), *aff'd*, 875 F.2d 907 (1st Cir. 1989). Importantly, it is not enough merely to raise the potential for such business concerns; instead, the tenant withholding consent must show that in its particular situation the particular concern is "objectively sensible and of some significance." Restatement (Second) of Property: Landlord & Tenant § 15.2 cmt. g. Thus, courts must consider not only the types of reasons advanced for the refusal of consent, but also the reasonableness of the specific factual underpinnings offered in support of those reasons.

■ As noted above, Safeway offered three reasons for its refusal to consent to the proposed changes and the removal of its surface parking structure, namely problems regarding (i) parking, (ii) the loading area, and (iii) visibility. The reasonableness of these grounds must be evaluated as of the time Safeway refused to grant consent, not *post hoc* on the basis of studies conducted and data collected by the parties subsequently or for this litigation. Those studies may be relevant with respect to other issues presented, including the likely consequences of the closure to the store as they pertain to the remedy question; yet, even if *post hoc* studies did not support Safeway's concerns or tended to show that those concerns were unfounded or of doubtful validity, it does not necessarily follow that the concerns were therefore an unreasonable basis on which to refuse consent.[31] In other words, Safe-

---

**30.** As the *Leggett* case notes, this Restatement § 15.2 applies to provisions regarding the withholding of consent to the assignment or subletting of a lease, not the common area restrictions at issue here; nonetheless, there is no reason in principle why the same standard should not apply in this context. *See Leggett*, 1995 U.S. Dist. LEXIS 6536 at *7 (holding that the analogy to the assignment and sublease contexts is persuasive). Other state law is in accord with the Restatement, placing the burden on the party challenging the reasonableness of the decision to withhold consent. *See, e.g., Fahrenwald v. LoBonte*, 103 Idaho 751, 653 P.2d 806, 811 (1982); *Haack v. Great Atl. & Pac. Tea Co.*, 603 S.W.2d 645, 649 (Mo.App.1980); *Jones v. Andy Griffith Products, Inc.*, 35 N.C.App. 170, 241 S.E.2d 140, 144 (1978).

**31.** In this regard, for example, some data supports the conclusion that Safeway was wrong to conclude that the switch to underground parking would hurt sales. Notably, the immediate short term sales data following the closure of the surface lot shows a short term increase in sales immediately after the surface lot was closed and shows sales in

way's bases for refusing consent may be debatable or rebutted by *post hoc* evidence, but that does not necessarily mean that these bases were unreasonable at the time the decision to refuse consent was made.

On this record, neither the loading dock concerns nor the considerations of visibility provide a reasonable basis for Safeway's refusal to withhold consent. Neither is "objectively sensible" or "of some significance" as required by the Restatement.

■ Although some of the original plans may well have presented unacceptable loading dock configurations for Safeway, in the proposed plan Safeway rejected, Safeway's dedicated loading dock would remain unchanged, and access to it, if changed at all, would be improved. Rather than having to thread their way through the general public parking lot, Safeway's trucks could proceed directly from Crystal Drive into Safeway's dedicated loading area. Although other loading for the building is to be consolidated at a single facility adjacent to Safeway's, the presence of a dock master should serve to prevent conflicts between Safeway's trucks and others. Thus, there is no persuasive evidence showing that Safeway's loading operations would be negatively affected by the proposed plan.

■ Safeway's visibility concern is equally unfounded, also falling short of reasonable under the circumstances. To be sure, placing a building in the parking lot in front of a store would normally have the effect of blocking the view of the store from the street, thereby reducing, at least to some extent, the general visibility of the store. Moreover, placing new stores in front of an existing store may negatively affect the intangible "presence" of the store, arguably reducing its ability to draw customers. *See K–Mart*, 694 F.Supp. at 1014–1015. Yet, as discussed above, the Plaza Shops Safeway store, unlike the store in *K–Mart*, is not a typical suburban grocery store fronted by a large open surface parking lot. Instead, the existing two-store parking structure, the presence of which Safeway long ago consented to, totally blocks any street view of the store. Furthermore, the store itself opens into the mall and therefore currently projects no street presence. Accordingly, the only visibility and presence the store currently has is provided by the existing signage, and the record shows that the signage, if anything, will improve under CESC's proposed urban revitalization project. Thus, although the *K–Mart* case indicates that visibility concerns may be reasonable grounds to withhold consent in some circumstances, visibility is not a reasonable ground to withhold consent in the circumstances at bar.

■ Although the question is a close one, Safeway's concerns regarding the elimination of the surface parking and the shift to underground parking is a reasonable ground for Safeway to withhold consent in this instance. The record reflects that, with the exception of the need to use the elevator,[32] there is no difference in

---

January 2003 more or less in line, if not above, the average weekly sales for 2002.

**32.** Mr. Hittman, Safeway's expert on supermarket design and management, testified that it took him a total of seven minutes to enter the garage, proceed through the elevator and down the corridor to the store, and back out again the same way. Yet, this testimony did not comport with the Court's experience on

the site visit, during which the round trip was shorter. Mr Hittman's testimony also ignores the fact that users of the surface lot likewise had to enter a garage through a single gated access point, collect a ticket, find a spot to park, negotiate around support columns in the parking lot, etc. Thus, in terms of time, the only additional inconvenience is the wait for the elevator and the elevator ride itself. There is no evidence in the record that this

customer convenience between surface parking and underground parking in this instance. Nonetheless, in refusing consent, Safeway relied on its experience with customers' perception of underground parking as less convenient and less secure than surface parking, and its fear that this perception would deter Safeway customers and harm sales. In these circumstances, Safeway's reliance on its experience, without undertaking any study, cannot be said to be unreasonable given the Restatement standard.[33] Safeway's concerns in this regard cannot be said to be without significance or based on mere caprice or whim or personal prejudice. *See* Restatement (Second) of Property: Landlord & Tenant § 15.2 cmt. g. Instead, they are based on Safeway's decades of experience.

While it is true that persuasive evidence was presented by Mr. Buckley that the customers' negative perception of underground parking was weakly based and relatively easy to change and that the experience in other parts of the country indicates that underground parking works well for urban grocery stores, this does not render Safeway's reliance on its concerns about underground parking unreasonable. Indeed, Safeway appears for the most part to agree with Mr. Buckley that urban customers will adapt to underground parking, given the proper incentives. After all, the

plans for the 18th Street Safeway store, which local Safeway executives advocated, involved exclusively underground parking. However, Safeway concluded that the store's current location in the Plaza Block does not provide adequate incentives for customers to accept the underground parking.[34] In short, Safeway reasonably declined to accept underground parking in this situation where it perceived no countervailing advantages.

CESC contends that Safeway's parking concerns were merely pretextual, and that Safeway's sole purpose in withholding consent was to ratchet up its bargaining power in order to extract a buyout agreement or other valuable concessions from CESC. Such a purpose would not be a reasonable ground to withhold consent. *See, e.g., Marriott,* 1994 WL 1031295 at *1. However, CESC fails to carry its burden of showing that Safeway's proffered parking concerns are pretextual and hence unreasonable.

First, CESC argues that Safeway's failure to perform any studies or analysis in deciding to withhold consent renders its decision unreasonable. As noted above, such studies are not a prerequisite for reasonableness in the circumstances at bar. Instead, "valid business reasons" that are "objectively sensible" and of

delay is significant, nor did the site visit indicated that the need to use the elevator resulted any significant delay.

33. This does not mean that there are no circumstances in which a party acts unreasonably in refusing consent solely on its business judgment. There may well be circumstances where some study may be necessary to render the withholding of consent reasonable. Yet, in these circumstances, given that customer perceptions are at the heart of Safeway's business experience and judgment, statistical surveys and analyses are not a prerequisite to a reasonable withholding of consent to eliminate surface parking.

34. On this point, the post-closing data suggests that CESC has the better argument. Although parking validation dropped significantly when the parking switched, it subsequently and promptly rose again and has approached historical levels. This suggests, consistent with Mr. Buckley's testimony, that customers are, in fact, adapting now to the new scheme, even though the Safeway store has nothing new to offer. Nonetheless, the conclusions warranted by of this *post hoc* parking data do not render Safeway's decision unreasonable at the time of refusal.

"some significance" are sufficient. Restatement (Second) of Property: Landlord & Tenant § 15.2 cmt g. There is no requirement that a party withholding consent to a proposed change perform an independent study of the effects of a proposed change. Safeway had valid and sensible grounds for its refusal to consent, namely its view of its customers' perceptions based on Safeway's extensive experience in the grocery business. In sum, a party refusing consent may rely on its business judgment, without internal or external independent analysis of the proposed change, provided the business judgment is soundly based on valid experience.

Second, CESC argues that the customers who drive to the Safeway are such a small percentage of the store's overall customers that, even if the driving customers are in fact deterred by the change in parking, it is unreasonable for Safeway to withhold its consent on this ground. Notwithstanding the *post hoc* evidence on this issue that persuasively suggests that the elimination of the surface parking lot and the switch to underground parking will not have a significant adverse effect on Safeway's sales in the long run, this evidence, contrary to CESC's argument, does not mean that Safeway's refusal, prior to the collection and analysis of this data, was unreasonable. CESC also argues that Safeway acted unreasonably in failing to study and appreciate the positive effects that CESC's urban revitalization plan will have on the Safeway store. However, Safeway is entitled to rely on its own business judgment and its own perception of how the proposed plan will affect its store, and need not have credited CESC's optimistic view of the effects of the plan or conducted its own independent analysis of the plan's effects.

Finally, CESC argues that Safeway's failure to negotiate with CESC indicates that Safeway's concerns with regard to parking were unreasonable and pretextual. The record reflects that Safeway remained that it would not consent to underground parking unless CESC agreed to a 50,000 s.f. store or a $2.5 million buyout. Yet, firmness in maintaining a negotiating position is not, absent more, evidence of bad faith. The record reflects that neither party descended to the level of bad faith or unclean hands. This does not mean, however, that the equities are equally balanced, as will be discussed below with regard whether a permanent injunction is appropriate.

In sum, although the question is close on this record, Safeway's decision to withhold consent to the proposed changes was not unreasonable. While CESC has carried its burden of showing that the loading dock and visibility concerns proffered by Safeway were unreasonable, it has not carried its burden of showing that Safeway's concerns with respect to the loss of surface parking and the switch to underground parking were not "objectively sensible" nor "of some significance." Restatement (Second) of Property: Landlord & Tenant § 15.2 cmt. g. Accordingly, Safeway is entitled to a declaration that its refusal of consent on the latter ground was reasonable, and therefore that CESC is in breach of the lease for its closure of the surface lot and continuation with the common area changes in the absence of Safeway's consent to that change. The question remains, however, whether an injunction is an appropriate remedy for this breach of the lease in the circumstances.

### III. Appropriateness of Injunctive Relief

■ Safeway bears the burden of showing that it is entitled to the "extraordinary remedy" of injunctive relief and is not limited to damages, if any, caused by

CESC's alteration of its common area in violation of the lease. *See Wright v. Castles,* 232 Va. 218, 224, 349 S.E.2d 125 (1986) (placing burden on party seeking injunction); *Chao v. Virginia Dept. of Transp.,* 157 F.Supp.2d 681, 689 (E.D.Va. 2001) (same), *rev'd in part on other grounds,* 291 F.3d 276 (4th Cir.2002); *Walgreen Co. v. Sara Creek Co.,* 966 F.2d 273, 275 (7th Cir.1992) ("The plaintiff who seeks an injunction has the burden of persuasion—damages are the norm, so the plaintiff must show why his case is abnormal.").

 According to circuit precedent, a permanent injunction is an appropriate remedy "where (i) there is no adequate remedy at law, (ii) the balance of the equities favors the moving party, and (iii) the public interest is served." *Nat'l Org. for Women v. Operation Rescue,* 914 F.2d 582, 585 (4th Cir.1990), *rev'd in part on other grounds sub nomine Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993); *Crutchfield v. United States Army Corps of Eng'rs,* 192 F.Supp.2d 444, 456 (E.D.Va. 2001); *see also Rambus v. Infineon Tech. AG,* 164 F.Supp.2d 743 (E.D.Va.2001). Although this three part articulation of the test for injunctive relief does not appear in the Virginia cases, it is consistent with Virginia case law, which likewise focuses on the inadequacy of damages, the balance of equities, and the public interest. *See Black & White Cars, Inc. v. Groome Transp. Inc.,* 247 Va. 426, 431, 442 S.E.2d

391 (1994) (holding that to secure an injunction, a party "must show irreparable harm and the lack of an adequate remedy at law"); *Wright,* 232 Va. at 224, 349 S.E.2d 125 (same); *Richmond v. Hall,* 251 Va. 151, 158, 466 S.E.2d 103 (1996) (holding that "[w]here the equities are equal, a Court of Equity will not interpose between two innocent men but will let the law prevail.") (citations omitted); *Akers v. Mathieson Alkali Works,* 151 Va. 1, 8–9, 144 S.E. 492 (1928) (holding that an injunction will not be awarded where "the plaintiff can be adequately compensated in damages," where "the injury to the defendant is greater than the benefit to the plaintiff," or where the injunction would result in a "serious detriment to the public."); *Mobley v. Saponi,* 215 Va. 643, 645, 212 S.E.2d 287 (1975) (holding that an injunction will not be granted where "the hardship to the defendant or to the public is disproportionate to the benefit the plaintiff would receive."). Because it is clear that three part test comports with Virginia law, it is used here to guide the inquiry into the appropriateness of injunctive relief here.[35] And, it is equally clear that the decision to grant or refuse an injunction is "a matter which rests in the sound discretion of the [court]." *Akers,* 151 Va. at 8, 144 S.E. 492; *see also Mobley,* 215 Va. at 645, 212 S.E.2d 287 ("Injunctive relief ... generally lies within the discretion of the [court.]"); 11A Wright & Miller, *Federal Practice & Procedure* § 2942 (declaring that "[p]erhaps

---

**35.** While it is clear that Virginia law governs the substantive question of whether Safeway's withholding of consent was reasonable or unreasonable, it is less clear whether the Court should be guided by federal law or Virginia law in determining whether an injunction is appropriate here. The better view is likely that this determination is substantive, not procedural, and thus Virginia law applies under *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). After all, it would

be awkward to apply Virginia law with regard to determine the bounds of Safeway's right to reasonably withhold consent, but then switch to federal law to determine the proper remedy for that state-law-defined right. At any rate, there is no dispositive difference between federal law and Virginia law on the question of whether an injunction should issue in these circumstances; thus, even if federal law governed, the same result would be reached.

**468**

the most significant single component in the judicial decision whether to exercise equity jurisdiction and grant permanent injunctive relief is the court's discretion.").

As a preliminary matter, Safeway asserts that under Virginia law, violations of restrictive covenants are routinely enforced through injunctions, even where there is no showing that damages are inadequate. For example, in residential cases involving restrictive covenants and setbacks from property lines, the Supreme Court of Virginia has found that there is no need for the plaintiff to show that damages are inadequate in order to obtain injunctive relief. *See Sonoma Development, Inc. v. Miller,* 258 Va. 163, 169, 515 S.E.2d 577 (enforcing restrictive covenant though injunction despite absence of evidence on the adequacy of damages and holding that "questions of convenience or inconvenience" and the potential disproportion in benefit and harm are not relevant); *Spilling v. Hutcheson,* 111 Va. 179, 182, 68 S.E. 250 (1910) (holding that if the parties have said that "the thing shall not be done," then injunctions are proper as simply enforcing the agreement the parties have made).

Yet significantly, both *Sonoma Development and Spilling* involve absolute setback restrictions on residential land with

no provision requiring reasonable consent by the other party. In such factual settings, the scope for the balancing of equities is more limited and the parties could reasonably be said to have bargained for an injunction as the sole remedy for breach of the restrictive agreement.[36] Therefore, "in such case[s] the injunction *does nothing more than give the sanction* of the process of the court to that which already is the contract between the parties," and the injunction is merely "the specific performance ... of that negative bargain which the parties have made, with their eyes open, between themselves." *Sonoma,* 258 Va. at 163, 515 S.E.2d 577. By contrast, the restriction at bar clearly involves the issue of the reasonableness of withholding consent, which on this record is very close. Given this, there is far greater scope here for the balancing of equities in this context.[37]

In other words, although the use of injunctions to enforce real property interests is common, it does not follow that an injunction is required in every case that relates to real estate or involves the enforcement of some type of restrictive lease provision. *See Walgreen,* 966 F.2d at 278–79 (noting that, though the case relates to real estate, "we hesitate to suggest that

---

**36.** The same cannot be said of the parties in this case. To the contrary, the parties here agreed that in the event of an unconsented common area change Safeway could cancel the lease or seek any other remedy available at law or in equity. Just as Safeway specifically bargained for a cancellation remedy, so to it might have bargained for an injunction as the sole remedy.

**37.** Safeway also relies on a Virginia case for the proposition that an injunction is "the most efficacious remedy" for the breach by the landlord of a restrictive agreement in a lease, and that "courts of equity have not hesitated to enforce by injunction" such restrictive agreements. *See Bookman v. Cavali-*

*er Court, Inc.,* 198 Va. 183, 186, 93 S.E.2d 318 (1956). Yet the *Bookman* case, which involves a restriction on the landlord's ability to rent nearby parcels to a competitive tenant, does not have the broad scope that Safeway contends, as is made clear by more recent Virginia case law limiting *Bookman* to its facts. *See Bradlees Tidewater, Inc. v. Walnut Hill Investment, Inc.,* 239 Va. 468, 472 n. 3, 391 S.E.2d 304 (noting in an assignment of lease case that *Bookman* is inapposite, as the case presented "does not involve a covenant of the type or dignity considered in *Bookman.*"). *Bookman,* in short, does not govern the common area consent lease provision here at issue.

every contract involving real estate should be enforceable as a matter of course by injunctions."). The Supreme Court of Virginia has adopted no such rule, but rather leaves the propriety of injunctive relief to the court's discretion, even where real estate interests are involved. For example, in *Mobley,* the Supreme Court of Virginia rejected the notion that the plaintiff was automatically entitled to injunctive relief because the flooding of his property constituted a trespass. *See Mobley,* 215 Va. at 645, 212 S.E.2d 287. To be sure, the *Mobley* opinion notes that an injunction "may be" granted for a continuing trespass on or permanent taking of land, and "is routinely afforded" to restrain the overburdening of easements. *Id.* But *Mobley* then goes on to reaffirm that "[i]njunctive relief ... generally lies within the discretion of the chancellor," and concludes that injunctive relief was properly denied in that case on the balance of the equities. *Id.*

In sum, there is no basis on these facts under Virginia law to waive the requirement that a party seeking a permanent injunction demonstrate that damages are inadequate, that the balance of equities is in its favor, and that an injunction is in the public interest. In other words, there is no reason to restrict the palette of available remedies here to an injunction; instead, analysis properly proceeds with the usual three part inquiry to determine whether the extraordinary remedy of an injunction is justified in the circumstances.

## A. Adequacy of Damages

▮▮▮ Whereas preliminary injunction analysis considers whether a harm is irreparable, and thus will not be capable of redress by the time of final judgment, the permanent injunction analysis focuses on whether the legal remedy of damages is inadequate. *See Crutchfield,* 192 F.Supp.2d at 456 n. 16; *see also Akers,* 151 Va. at 8, 144 S.E. 492 (focusing on "whether the complainant can be adequately compensated in damages"). Nonetheless, showing that the harm suffered will be irreparable by the award of monetary damages is a common means of showing that the legal damages remedy is inadequate.[38] *See Crutchfield,* 192 F.Supp.2d at 456 n. 16. Thus, the question presented on this factor is whether Safeway's alleged harm can be adequately compensated through the award of monetary damages.

Safeway argues that money damages are inadequate here because the actual damages are difficult to ascertain. *See Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546, 551 (4th Cir.1994) (holding that "generally irreparable injury is suffered when monetary damages are difficult to ascertain or inadequate") (citation omitted); *Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d 189, 196–196 (4th Cir.1977) (holding that the award of damages based on "past profits" would not adequately compensate plaintiff for the damage to goodwill, which was "incalculable."). Here, Safeway contends that, just as in *Multi–Channel* and *Blackwelder,* the closing of the parking structure will result in the loss of future customers and the harm to Safeway's general goodwill, that these losses are difficult to calculate and quantify, and thus that damages are inadequate.

Although *Multi–Channel* and *Blackwelder* contain broad language regarding

---

**38.** As a result, inadequacy of damages and irreparability of harm are often treated interchangeably in the permanent injunction analysis. *See, e.g., Black & White Cars,* 247 Va. at 431, 442 S.E.2d 391 (holding that a party seeking an injunction must show irreparable harm *and* the lack of an adequate remedy at law).

the availability of injunctive relief when the loss of future customers or harm to goodwill renders the calculation of damages difficult, neither holds that injunctive relief is automatic and required in such circumstances. Thus, the *Multi–Channel* opinion states that when the failure to grant an injunction "creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *Multi–Channel,* 22 F.3d at 552 (citing *Merrill Lynch, Pierce, Fenner and Smith v. Bradley,* 756 F.2d 1048, 1055 (4th Cir.1985)). The *Blackwelder* opinion holds that "[i]rreparability of harm includes the impossibility of ascertaining with any accuracy the extent of the loss." *Blackwelder,* 550 F.2d at 197. Yet, in both cases the Fourth Circuit proceeds to analyze the specific facts of the case before determining that the loss of future customers or the harm to goodwill makes damages difficult to ascertain.

In *Multi–Channel,* the panel noted that historical average past performance would not be an adequate basis to ascertain damages, given the novelty of the service offered by the cable company and the ability of customers to order that service *a la carte. Multi–Channel,* 22 F.3d at 552. These circumstances do not exist here; the Plaza Shops Safeway store has been in business since 1967, and has not significantly changed its format since 1985. There is an abundance of sales and profits data available for this store that provides an excellent baseline from which it is possible to calculate damages, if, as Safeway contends, the elimination of surface parking will have an adverse impact on store sales. Indeed, Safeway's current claim is that the switch to underground parking is clearly the death knell for the store. Presumably, Safeway believes it can prove this, in which event Safeway's own damage figure for that eventuality, as the record

reflects, is $2.5 million. Testimony by Mr. Castleberry and Ms. Black indicates that Safeway regularly studies the overall contribution of a store to Safeway's profits and that there is a standard Safeway store closing analysis model that Ms. Black used to derive the $2.5 million figure. Loss of sales, short of closing the store, is also quantifiable; indeed, there is a pro forma analysis in the record of the effect of various percentage losses of sales on the Safeway store. Mr. Hittman, Safeway's supermarket expert, also testified that the lost profits would be readily calculable. In sum, unlike in *Multi–Channel,* there is nothing in the record to suggest that damages in this case would be difficult to ascertain with reasonable accuracy, whether the breach is shown to reduce store sales or require the store's closing. Accordingly, there is no showing on this ground that monetary damages are inadequate.

In *Blackwelder,* the Fourth Circuit held that Blackwelder's "past profits on Seilig furniture afford a plausible basis for calculating some of the damages," but that the harm to goodwill would render the overall loss difficult to ascertain. *Blackwelder,* 550 F.2d at 197. Specifically, the *Blackwelder* opinion notes that goodwill and reputation would be harmed (i) because of "customer grumbling" and reputational harm caused by Blackwelder's inability to honor outstanding orders for Seilig furniture and (ii) because losing Seilig will harm Blackwelder's efforts to become known as a "full-line" furniture discounter. *Id.* Similarly, in the *K–Mart* case, injunctive relief was not justified merely because the construction of a building in front of the K–Mart store would lead to lost customers; instead, the injunction was proper because the "visual obstruction" of the K–Mart store would harm goodwill by affect-

ing the "presentation of the store," and, most significantly, by "detracting from the desired uniformity in K–Mart stores across the nation." *K–Mart,* 875 F.2d at 915. The district court in *K–Mart* found specifically that the uniformity of appearance of K–Mart's stores is important to its brand image, and that the bargained-for open space in front of the store is vital to that image. *K–Mart,* 694 F.Supp. at 1016. This finding was central to its conclusion that the "uniformity of appearance is part and parcel of the presentation of the store to the public and it is this presentation that defendants have irreparably harmed." *Id.*

On this record, there is no similar showing that Safeway will suffer harm to its reputation and goodwill as a result of the switch to underground parking and the construction of retail stores extending to Crystal Drive. Indeed, such a claim is at least far-fetched. Safeway cannot plausibly claim that the switch to underground parking at the Plaza Shops Safeway store or, indeed, even the loss of the store, will somehow harm its brand or goodwill. Relevant in this regard is the record evidence indicating that Safeway uses a variety of store configurations, including stores with underground parking or no parking, and stores, such as this one, with little to no street presence. Thus, the changes proposed here, including a switch to underground parking, cannot be said to damage a uniform brand image, as in *K–Mart.* Nor can Safeway plausibly argue that the loss of this particular store will significantly harm its overall reputation among customers in the trade area. In this respect, the Plaza Shops Safeway store is one of the smallest and least successful stores in the Eastern Division, and is virtually hidden within the Plaza Shops mall. In other words, given the store's almost complete lack of presence, there is no persuasive evidence that the closure of this particular store would have a significant impact on Safeway's general presence in the overall trade area. In other words, even if CESC's urban revitalization project leads to the closure of this store, there is no persuasive evidence suggesting that the resultant harm to Safeway's goodwill, if any, would be significant or so difficult to ascertain that it justifies the entry of a permanent injunction in this case.

In sum, Safeway's reliance on *Multi–Channel* and *Blackwelder* to support its arguments that damages are inadequate is misplaced. Neither case teaches that an injunction is always appropriate whenever there is a showing of a likely loss of future customers or harm to goodwill. After all, breaches of lease or contract often result in the loss of future business and cause harm to goodwill. If injunctions were appropriate in all such cases, injunctive relief would cease to be an "extraordinary" remedy, and would be available in virtually every case involving a breach of an agreement that affects future business. *Multi–Channel* and *Blackwelder* require no such result. Absent any specific, persuasive evidence showing that the damages here will be especially difficult to calculate, or that Safeway is threatened with a loss of goodwill that is significant but incalculable, Safeway is not entitled to permanent injunctive relief. Indeed, if, as Safeway contends, the loss of underground parking will be the death knell of the Plaza Shops store, or will result in decreased sales at the store, Safeway's own evidence leaves little doubt that damages are readily calculable and adequate. Nor is Safeway's contention that the loss of this store will harm its general goodwill persuasive. Accordingly, Safeway has not met its burden of showing that legal damages in these cir-

cumstances are an inadequate remedy.[39]

## B. Balance of the Equities

Virginia law reflects that the balance of equities inquiry is wide-ranging and includes a variety of factors. Generally, this inquiry consists, at least in part, of a balance of the hardships imposed on the defendant if the injunction is granted versus the hardships imposed on the plaintiff is the injunction is denied. *See Akers*, 151 Va. at 9, 144 S.E. 492 (holding that "the court should weigh the injury that may accrue to the one or the other party, and also the public, by granting or refusing the injunction"); *Mobley*, 215 Va. at 645, 212 S.E.2d 287 (holding that "[i]f the hardship to the defendant or to the public is disproportionate to the injury to the plaintiff, the chancellor properly may deny injunctive relief and leave the plaintiff to his remedy at law."); *see also Crutchfield*, 192 F.Supp.2d at 462 (considering, *inter alia*, the injury suffered by the plaintiff suffered by a plaintiff absent an injunction and the

hardship the defendant will incur if an injunction is issued).[40] Thus, for example, in *Akers* it was held that the balance of equities weighed strongly against the entry of an injunction where the injunction "would be of little benefit to the complainant and would cost the defendant $1,000,000.00." *Akers*, 151 Va. at 8, 144 S.E. 492.

In addition, the balancing of the equities also typically includes consideration of other traditional equitable factors, such as the innocence or culpability of the parties, the presence or absence of bad faith or ill motive on the part of either party, unclean hands, delay, and laches. *See, e.g., Mobley*, 215 Va. at 646, 212 S.E.2d 287 (noting that the chancellor found that the defendant "intended no injury" and noting the absence of any evidence of "wilful, wanton, or even negligent act" on the part of the defendant); *Richmond v. Hall*, 251 Va. at 158, 466 S.E.2d 103 (holding that, "[w]here the equities are equal, a Court of Equity

---

**39.** In the *Walgreen* case relied on by Safeway, Judge Posner agrees that the decision to award damages or an injunction is one in which the trial judge enjoys considerable discretion. *See Walgreen*, 966 F.2d at 275. However, Judge Posner proposes a "law and economics" approach to making this decision, in which the "choice between the remedies requires a balancing of the costs and benefits of the alternatives." *Id.* This approach involves not only a consideration of which remedy would be more costly to administer, but also whether an award of damages or a figure negotiated by the parties subsequent to the issuance of an injunction would most accurately and efficiently reflect the true damages imposed by the breach. *Id.* at 275–77. Whatever the merits of this law and economics analysis, it is not yet endorsed in Virginia law or the law of this circuit, and hence it is not applied here.

Worth noting, however is that even if the *Walgreen* law and economics approach were applied here, the same result would obtain. In *Walgreen*, the landlord had some flexibility to abandon its plan to rent to the tenant for which consent was refused and to pursue

other tenants and opportunities. *Id.* at 278. Here, CESC cannot proceed with any meaningful revitalization plan without Safeway's consent. In addition, there is likely a broad bargaining range between the actual damage Safeway expects to result from the proposed changes and the value CESC places on going forward with its $40 million urban revitalization plan. *See id.* at 278 (discussing *Boomer v. Atlantic Cement Co.*, 26 N.Y.2d 219, 309 N.Y.S.2d 312, 257 N.E.2d 870 (1970)). Thus, a problematic "bilateral monopoly" likely exists, and negotiations following the issuance of an injunction might well prove unsatisfactory. *See id.* at 276. Therefore, unlike in *Walgreen*, where such concerns were minimal, a law and economics analysis might well show that an injunction is not desirable here.

**40.** Although, as is clear from the citations above, Virginia cases frequently commingle the consideration of the balance of harms to the parties with the consideration of the public interest, here the public interest is considered separately below.

will not interpose between the two innocent men, but will let the law prevail"); *see also Crutchfield,* 192 F.Supp.2d at 462–63 (discussing whether the defendant "can[ ] be considered an innocent party" in light of "a lack of good faith" and "attempts to evade regulatory scrutiny," whether the defendant was on notice, whether the defendant "comes to court with clean hands," and, conversely, whether the plaintiffs are "lacking in equity" because they "unreasonably delayed in seeking injunctive relief.")

Here, the respective hardships portion of the balance of equities consideration weighs decisively in CESC's favor. As in *Akers,* the record here suggests that a permanent injunction would be of questionable benefit to Safeway but very damaging to CESC. In this regard, the *post hoc* data, although not relevant to the question whether Safeway's refusal to consent was reasonable, is important in assessing or measuring the likely damage to Safeway of not granting an injunction. As discussed above, the data indicates that at most 10%, and likely closer to 3% of Safeway's customers rely on the surface parking lot. Arguably, some or all of this small percentage of shoppers might be put off by the switch to underground parking and thus shop elsewhere. At worst, the switch to underground parking would cause the

loss of this small percentage of customers. Significantly, however, the post-closing data indicates that the number of customers parking in the underground lot has already risen to approximately 40 customers on average per day, compared to 50 customers per day who parked in the surface lot before it was closed. This suggests that the loss of driving customers, if any, is temporary and slight. Furthermore, the post-closing weekly sales data actually shows an increase in revenues over the period immediately prior to the closing of the surface lot, and are in line with average weekly sales figures for the year. Taken together, as discussed above, this data indicates that the long term harm to Safeway caused by the switch to underground parking is likely not significant.[41]

By contrast, the record clearly reflects that CESC faces significant harm if an injunction issues. At best, an injunction will operate to delay and disrupt CESC's urban revitalization project, even assuming that the parties ultimately reach some agreement that results in vacating the injunction.[42] The ripple effect of such a delay in disrupting the overall, $40 million urban revitalization project may be more significant than any initial direct ·costs. With the impending departure of the PTO, and the need to attract new tenants in its

41. Notwithstanding the recent data that suggests little or no harm, the worst case scenario in terms of harm to Safeway is that the switch to underground parking will render the store unprofitable and force it to close. In this regard, the general downward trajectory of the store's performance implies that the store would likely fail well before the expiration of the lease options in 2015, which even Mr. Castleberry admits is the maximum feasible life of this Safeway store. Thus, any harm caused to Safeway by the failure to grant a permanent injunction will consist, at most, of the damage caused by store failing and closing earlier than otherwise would have occurred. In this regard, Safeway's willing-

ness to accept a $2.5 million buyout offer places a maximum value on the store as an ongoing concern; given the significant competitive challenges the store faces and its trending loss of sales, the actual value may well be far lower. At any rate, even in the worst case scenario, the harm to Safeway in withholding the injunction would be at most $2.5 million. As noted, however, recent actual data suggests that the harm caused by the lack of an injunction will be *de minimis.*

42. In its Motion to Increase Bond, CESC estimated the direct costs of such delay at $5,000 per day.

place, the consequences for CESC of such delay and disruption come at a crucial time for CESC. At worst, the injunction, if permanent, will likely frustrate the purpose of the project and lead to its abandonment, as is discussed in more detail with regard to the public interest inquiry. A permanent injunction may compel CESC to abandon the project and forfeit its significant investment in the urban revitalization project, including the time, money, and resources it has expended in designing the project, obtaining approval from the County, drawing up the plans, and negotiating with prospective tenants.

In sum, based on the record evidence regarding the post-closure parking validations and weekly store sales, it appears that Safeway will suffer little or no harm as a result of the switch to underground parking. Even assuming that the switch to underground parking somehow causes the Plaza Shops Safeway store to fail and close, the harm to Safeway will consist of the loss of a store worth, at most, by its own calculation, $2.5 million dollars. By contrast, granting the injunction will continue to delay and disrupt CESC's $40 million urban revitalization project, and may ultimately force CESC to abandon the project. Thus, the balance of hardships weighs decisively in CESC's favor.

As to the consideration of equitable factors such as the presence of bad faith, ill motives, or unclean hands, as previously noted, neither parties' actions descended to the level of bad faith, and neither party comes to the court with clearly unclean hands. That being said, the record does reflect that Safeway refused consent without conducting any independent analysis or study of the likely actual effect of the switch from surface parking to underground parking on its store. Nor did Safeway actively study the question of whether the alleged benefits of the overall urban revitalization project would actually have a positive effect on the store that might outweigh or render trivial the adverse affect of the loss of the surface parking lot. Finally, the record also shows that, while CESC proposed a string of concessions—including dedicated parking spots, a new dedicated elevator, a redesigned loading dock, improved signage, even a guarantee of profitability—in an effort to alleviate Safeway's professed concerns and entice Safeway to consent to the removal of the surface parking, Safeway remained firm in its bargaining position, and did not seriously entertain those offers.

While the facts do not reflect any bad faith on Safeway's part, nor do they taint the reasonableness of Safeway's refusal to consent, they do weigh, modestly, in CESC's favor on the balance of the equities. To put this point colloquially, Safeway's hat, as it reflects Safeway's conduct in this matter, is white, not black, but it could be a brighter white. Concerns of fairness and equity suggest that Safeway's inflexibility should not be rewarded with the extraordinary remedy of an injunction, particularly where the granting of an injunction would pose considerable harm to the opposing party.

In sum, considering both the balancing of likely harm as well as the more intangible equitable factors, the balance of the equities weighs strongly in this instance against the granting of an injunction. Thus, it is appropriate to limit the plaintiff's remedies to the pursuit of legal damages, particularly where there is so little evidence that any such damages can be shown. *See Mobley*, 215 Va. at 644–45, 212 S.E.2d 287 (holding that a plaintiff is properly limited to a damages remedy in a situation where the defendant acted innocently and in good faith and the plaintiff sought an injunction even though the harm

shown was "almost a De minimis situation").

## C. Public Interest

The public interest considerations in this matter also weigh strongly against the issuance of an injunction. Arlington County's approval for this urban revitalization and redevelopment project, coupled with CESC's persuasive expert testimony leave no doubt that an injunction is not in the public interest.

CESC's urban revitalization plan was submitted to Arlington county for approval in October 2000, and was ultimately approved seven months later. The plan involves major changes to the Plaza Block and the surrounding area, including (i) the elimination of the current parking structure and its replacement by new retail stores, (ii) the conversion of Crystal Drive into a two-way street, with additional accompanying changes to the area's traffic pattern, and (iii) an altered and improved pedestrian landscape including new sidewalks and restaurants with streetside cafes. The plan is designed to transform the character of the neighborhood by extending retail activity from the weekdays into the evenings and on weekends. Given these significant changes, the County's stamp of approval on the urban revitalization project is powerful evidence that the project has received significant public scrutiny and has been found by the community to be in its interest. In addition, Mr. Buckley argued persuasively that the changes caused by the urban revitalization project would benefit all members of the Crystal City community, including commercial and retail tenants of the Plaza Block and the thousands of nearby residents. In short, the revitalization of the area is intended to make the Crystal City area a more desirable area to live, work, and shop; a goal that is manifestly in public interest.

The record as a whole also makes clear that, were a permanent injunction granted in this case, the inability to eliminate the parking structure and replace it with a revitalized street front would likely be fatal to the urban revitalization project. It may not be possible to make Crystal Drive a two-way street without using some of the space currently occupied by the parking structure, and there is little or no other space available in the Plaza Block area where new retail space could be inserted. Furthermore, the parking structure is totally incompatible with the revitalization plans; it presents a bleak, uniform street front for the entire length of the Plaza Block and leaves no room for a sidewalk. In short, if a permanent injunction issues requiring no change of the common area, i.e., preservation of the surface parking area and the parking structure, the essential purpose and raison de etre of CESC's urban revitalization project will have been frustrated.

Finally, given (i) the closeness of the question as to whether Safeway's withholding of consent was reasonable, (ii) the adequacy of the damages remedy in addressing Safeway's purely economic harms, which should be readily calculable, (iii) the weighing of the balance of equities in favor of CESC, and (iv) the strong public interest in the redevelopment plan, the drastic remedy of a permanent injunction is unwarranted. On the contrary, the enforcement of the private bargain struck between CESC and Safeway through an injunction would cause considerable public harm; thus, denying the injunction and allowing Safeway to seek redress through the award of damages is clearly in the public interest in this case.

## IV. Conclusion

In sum, Safeway's decision to withhold consent to the changes to the shopping center's common area planned by CESC as part of its urban revitalization project was unreasonable insofar as it was grounded on concerns with regard to loading dock access and visibility, but was reasonable insofar as it was grounded on Safeway's concern that the switch in parking from a surface lot to an underground lot would cause a loss of customers and sales. Thus, CESC's actions in closing the parking structure and proceeding to alter the shopping center common area pursuant to the redevelopment project constituted a breach of the lease. Nonetheless, in the exercise of its equitable discretion, the Court finds that, although Safeway is entitled to a remedy at law for its damages pursuant to CESC's breach of the lease agreement, a permanent injunction is not appropriate in this case and will not issue. Accordingly, an order will issue lifting the existing restraining order and setting a date for a jury trial on the damages to Safeway of CESC's breach of the lease.